FILED BY _CRM_ D.C.

NOV 0 9 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**PLAINTIFFS UNDER SEAL,**                )
                                          )
                                          )      **CIVIL ACTION NO.** __18-cv-62735 Williams__
                                          )
**v.**                                    )      **FILED UNDER SEAL**
                                          )
                                          )      **JURY TRIAL DEMANDED**
**DEFENDANTS UNDER SEAL.**                )
                                          )

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729 (a)(1)(A)(B)(C) AND FLORIDA FALSE CLAIMS ACT**

Respectfully submitted,

ROBERT W. MURPHY, ESQ.
Attorney for Plaintiffs/ Relators
Florida Bar No. 717223
1212 S.E. 2nd Avenue
Fort Lauderdale, Florida 33316
Telephone: (954) 763-8660
E-mail: rwmurphy@lawfirmmurphy.com

Dated:    November _9th_ 2018

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ***ex rel.* Jacksonville Area Legal Aid, Inc.,** ) | |
| **a Florida non-profit, and Coast** ) | |
| **to Coast Legal Aid of South Florida, Inc.,** ) | |
| **a Florida non-profit,** ) | **CIVIL ACTION NO._____** |
| ) | |
| **STATE OF FLORIDA, ex rel.** ) | **FILED UNDER SEAL** |
| **Jacksonville Area Legal Aid, Inc. and** ) | |
| **Coast to Coast Legal Aid of South** ) | |
| **Florida, Inc,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **FINANCIAL FREEDOM, LLC,** ) | |
| **REVERSE MORTGAGE SOLUTIONS,** ) | |
| **INC., and MR. COOPER, LLC,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 (a)(1)(A)(B)(C) AND FLORIDA FALSE CLAIMS ACT

1.     The United States of America and the State of Florida, by and through *qui tam*

Relators, Jacksonville Area Legal Aid, Inc. ("JALA") and Coast to Coast Legal Aid of South

Florida, Inc. ("CTC") bring this action under the Federal False Claims Act, 31 U.S.C. § 3729

(a)(1)(A)(B)(C) ("Federal False Claims Act") and under the Florida False Claims Act, Fla. Stat.

§68.081 *et seq* ("Florida False Claims Act") to recover all damages, penalties and other remedies

established by the Federal False Claims Act and Florida False Claims Act on behalf of the

United States and the State of Florida , and would show the following:

-2-

## I. INTRODUCTION

2.      The mortgage industry has faced many challenges, putting strain on individuals, banks, the Court system, and federal and state government agencies.

3.      Home Equity Conversion Mortgages (HECM) have put an unprecedented strain on senior citizens[1] ability to stay in their homes and on the Courts' systems. This strain is highlighted by data provided by the United States Department of Housing and Urban Development showing that reverse mortgage foreclosures have increased at least 646% from 2009 to 2016. *See New FOIA Response from HUD Reveals 646% Increase in Foreclosures against Seniors in 2016*, November 15, 2017, California Reinvestment Coalition.[2] Data from HUD relating to just one lender revealed a 302% increase in its foreclosures filed. *Id.* During that period of time there were at least 13,600 reverse mortgage foreclosures filed in Florida. *Id.* In fact, a program created by HUD to turn around the tide of increased reverse mortgage foreclosure lawsuits filed against widows and widowers has not been successful. *See Federal Reverse Mortgage Program Results in Widows Losing Their Homes After Death of Spouse, March 12, 2018, California Reinvestment Coalition.[3]*

4.      In 2009, HUD merged the HECM and FHA forward programs together in an effort to bolster the forward mortgage program. But that policy move has backfired. The FHA actuarial report showed that the post-2008 HECM loan portfolio has just $1 billion in capital. And the reverse mortgage program is projected to generate $15.5 billion in loan losses for the FHA Mutual Mortgage Insurance Fund over the next 30 years.  Meanwhile, the forward FHA program has

---

[1] A borrower must be at least 62 years old to obtain a HECM mortgage, no payments are required but the borrower must maintain all property charges such as ad valoreum taxes and hazard insurance.

[2] Article located at http://www.calreinvest.org/news/new-foia-response-from-hud-reveals-646-increase-in-foreclosures-against-seniors-in-2016.

[3] Article located at http://www.calreinvest.org/news/federal-reverse-mortgage-program-results-in-widows-losing-their-homes-after-death-of-spouse.

steadily improved over the last six years. It is now projected to generate a profit of $38 billion over 30 years.[4]

5.    The mortgage industry has a long-standing history of government involvement. In 1934, the Federal Housing Administration ("FHA") was established by the National Housing Act of 1934. In 1938, the Federal National Mortgage Association, known as "Fannie Mae," ("FNMA") was created. As noted by the U.S. Department of Housing and Urban Development ("HUD") website (http://portal.hud.gov/hudportal/HUD?src=/about/hud_history):

"In 1965, the Department of Housing and Urban Development Act of 1965 creates HUD as Cabinet-level agency. In 1992, the Federal Housing Enterprises' Financial Safety and Soundness Act of 1992 creates HUD Office of Federal Housing Enterprise Oversight to provide public oversight of FNMA and Federal Home Loan Mortgage Corporation (Freddie Mac). In 1998, HUD opens Enforcement Center to take action against HUD-assisted multifamily property owners and other HUD fund recipients who violate laws and regulations. Congress approves Public Housing reforms to reduce segregation by race and income, encourage and reward work, bring more working families into public housing, and increase the availability of subsidized housing for very poor families. In 2000, America's homeownership rate reaches a new record-high of 67.7 percent in the third quarter of 2000. A total of 71.6 million American families own their homes, more than at any time in American history."

6.    According to the Federal Bureau of Investigation, "[m]ortgage fraud schemes are particularly resilient, and they readily adapt to economic changes and modifications in lending practices. Mortgage fraud perpetrators include licensed/registered and non-licensed/registered mortgage brokers, lenders, appraisers, underwriters, accountants, real estate agents, settlement attorneys, land developers, investors, builders, bank account representatives, and trust account representatives."(http://www.fbi.gov/stats-services/publications/mortgage-fraud-2010/2010-mortgage-fraud-report).

---

[4] https://www.nationalmortgagenews.com/news/calls-intensify-to-separate-reverse-mortgages-from-fha-fund

-4-

7.     In August 2017, the Consumer Financial Protection Bureau ("CFPB") issued a report warning older consumers about taking out a reverse mortgage loan in order to bridge the gap in income while delaying Social Security benefits until a later age. The CFPB report found, in general, the costs and risks of taking out a reverse mortgage exceed the cumulative increase in Social Security lifetime benefits that homeowners would receive by delayed claiming. The Bureau also released a consumer guide and video to help prospective borrowers and their families understand how reverse mortgages work so that they can make an informed decision before agreeing to borrow. http://files.consumerfinance.gov/f/documents/201708_cfpb_costs-and-risks-of-using-reverse-mortgage-to-delay-collecting-ss.pdf.

8.     This suit concerns fraud perpetrated against the U.S. Government and the State of Florida through false and fraudulent claims in the reverse mortgage servicing industry.

## II. PARTIES

9.     Jacksonville Area Legal Aid, Inc. ("JALA") and Coast to Coast Legal Aid of South Florida, Inc. ("CCLA") are Florida non-profit corporations which are organized as 501(3)(c) entities under the laws of the United States. Relators, JALA and CCLA, bring this civil action for violations of 31 U.S.C. § 3729 (a)(1)(A)(B)(C), for themselves and for the United States Government and State of Florida pursuant to 31 U.S.C. § 3730(b)(1).

10.     Defendant, Financial Freedom, LLC is a Pennsylvania limited liability company doing business in the State of Florida ("Financial Freedom" or "Defendants").

11.     Defendant, Reverse Mortgage Solutions, Inc. is a Delaware corporation doing business in the State of Florida ("Reverse Mortgage Solutions" or "RMS").

12.     Defendant, Mr. Cooper, LLC ("Mr. Cooper"), is a Delaware limited liability company formerly known as "Nationstar," doing business in the State of Florida.

### III.  JURISDICTION AND VENUE

13.      This action arises under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(A)(B)(C).

14.      Jurisdiction over this action is conferred on this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 in that this action arises under the laws of the United States of America.

15.      Venue is proper in the United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a) because the Defendants transact business in this District and the facts forming the basis for the Complaint occurred in this District.

### IV.  PRELIMINARY STATEMENT

16.      Relators are non-profit corporations providing legal services to poor, low-income and elderly persons and families in the State of Florida.  Realtors employ attorneys, para-professionals and staff members who have specialized knowledge concerning the servicing of reverse mortgages.

17.      Defendants are a publicly-traded companies and are approved servicers for FHA/ HUD and FNMA.

18.      Defendants are in the business of servicing reverse mortgages, which are government Federal Housing Administration ("FHA") insured loans available to seniors who are at least 62 years old. Defendants originate and securitize loans into Government National Mortgage Association ("GNMA") securities, and services the loans through their lifecycle.  Due to the nature of the loans, many of these loans end up in default and foreclosure, often for reasons that are no fault of the elderly borrowers.  No payments are required but borrowers must pay all property charges directly. At the end of the foreclosure cycle, the servicer files a claim to HUD for the insurance to cover losses.

19. The guidelines are very specific as to servicing through the default cycle, and the insurance claim process. Under FHA regulations, servicers are required to meet a series of event-specific timeframes during the default, foreclosure, conveyance, and mortgage insurance claim cycles. Failure to meet any processing deadlines stops the accrual of debenture interest otherwise payable in satisfaction of a claim under the FHA mortgage insurance contract. The servicer is responsible for making the investor whole for any interest curtailment due to not meeting the required event-specific timeframes.

20. When a Borrower defaults (most common causes are due to a purported non-occupancy for a period in excess of one year, death, or not paying taxes or property insurance), there is a Due and Payable Date established, and the servicer has to take certain actions with specific timeframes from that date. One of the first actions required is to obtain an appraisal within thirty (30) days of the Due and Payable Date (24 C.F.R. § 206.125(b)), and if the servicer does not obtain the appraisal within thirty (30) days then HUD will not reimburse interest at the debenture rate of interest from the date the appraisal should have been obtained, to the date the claim is paid. By not self-disclosing on the insurance claim that Defendants did not obtain the appraisal within the required timeline, they are filing a false or misleading mortgage insurance claim with HUD, resulting in HUD paying the debenture interest for the entire period up through the date the claim is paid.

21. When a Borrower defaults, there is a Due and Payable Date established, and the servicer has to take certain actions with specific timeframes from that date. A required action is to take "first legal action" (24 C.F.R. § 203.355) toward foreclosure within six (6) months of the Due and Payable Date, unless an extension of such date is granted (24 C.F.R. § 206.129). If the servicer does not take "first legal action" within six (6) months, then HUD will not reimburse interest at

-7-

the debenture rate of interest from the date the first legal action should have been taken, to the date the claim is paid.

22.     When reverse mortgage Borrowers default on their reverse mortgage loans as a result of unpaid property taxes and/or unpaid homeowners insurance premiums, the Borrowers can apply for the Florida Elderly Mortgage Program (hereinafter "ELMORE"). This program is administered by the Florida Housing Finance Corporation (hereinafter "FHFC").

23.     Through the ELMORE Program, the United States has allocated funding to assist senior homeowners with a reverse mortgage remain in their homes by providing eligible borrowers up to $50,000 to bring their property taxes, homeowner's insurance, flood insurance and/or homeowners/condo association dues (property charges) current, to the extent that these property charges have been paid on behalf of the senior homeowner by the servicer of their reverse mortgage. The senior homeowner may also be eligible to have up to 12 months of future property charges paid on their behalf, as well. The program is available in all 67 counties in the State.

24.     If the Borrowers are approved for funding from FHFC for ELMORE, FHFC will request payoff figures to reinstate the loan from the reverse mortgage company, generally through the mortgage servicers. The servicers or reverse mortgage company will then provide FHFC with the payoff figures to reinstate the Borrowers loan.

25.     Under Federal law, reverse mortgage Borrowers who are in default, are only required to repay, for the purposes of reinstatement, those property charges related to unpaid property insurance premiums and/or unpaid property taxes. When a Borrower defaults under the Home Equity Conversion Mortgage (hereinafter "HECM"), the Borrower is allowed to reinstate by correcting the condition that resulted in the default. Pursuant to the HECM, Borrowers are allowed to reinstate even after foreclosure proceedings have commenced.

-8-

26.     Thus, under the HECM contract, when a Borrower defaults due to unpaid property taxes and/or homeowner's insurance, to reinstate, the Borrower needs only repay property charges which were advanced by the servicer. The servicers must add any additional sums, i.e. attorneys' fees, inspection fees and costs, to the principal balance of the mortgage.

27.     Paragraph 5 of the HECM provides that any foreclosure costs, attorney's fees and any expenses associated with the foreclosure are to be added to the principle loan balance. A copy of the HECM is attached as Exhibit "A".

28.     However, it appears that the reverse mortgage servicers are adding additional charges, fees, and cost to the default amount and submitting these inflated claims to FHFC for payment/reimbursement in violation of HECM and HUD Guidelines and the mortgage and note.

29.     A copy of the HUD Mortgagee Letter which provides a process for the service collecting foreclosure attorney's fees is attached hereto as Exhibit "B".

30.     Furthermore, the Federal Government provides for a process for the reverse mortgage servicers to claim these other charges, fees, and costs when submitting the HECM claim for payment. It is clear that these servicers or reverse mortgage companies are double dipping.

31.     The servicers response to this overbilling/overpayment has been mixed. Some servicers have taken the position that they are entitled to the inflated amounts. Other servicers have flat out denied that they even requested the overage and, they posit that ELMORE/FHFC voluntarily made the overpayment to the servicers despite the servicers having submitted the correct reimbursement amount.

32.     ELMORE funds are forgivable loans that require the Borrower to execute a subordinate Note and Mortgage encumbering the property for the amount paid to the servicer to cure the default. **Thus, when the servicer is requesting funds from FHFC/ELMORE which**

**exceeds the actual default amount, the Borrower encumbers the property with these inflated amounts.**

33.     If the Borrower defaults under the ELMORE subordinate Mortgage or Note, the Borrower is now responsible to repay amounts the Borrower was never responsible for under the HECM agreement.

34.     When the Borrower is approved for ELMORE funds, a portion of the award is set-aside to pay the following year's property taxes and/or homeowner's insurance. If the Borrower does not use the funds within a year, the servicers are misappropriating the set-aside funds by applying the money to the principal loan balance.

35.     Under the reverse mortgage agreement, the Borrower is not responsible for the principal loan balance (while the loan is in good standing). Therefore, the ELMORE funds should not be applied to the principal loan balance by the servicer. This practice by the services is not disclosed to the Borrowers.

36.     In addition, in some cases, the Borrowers were told by the servicers that Borrower cannot use the ELMORE set-aside funds to pay the following year's property taxes and/or property insurance premiums, prior to the one year. The Elmore funds set-aside to pay the following year's property taxes and/or property insurance premiums are not being used for their intended purpose which causes harm to the Borrowers. If the Borrower is prevented from using the set aside ELMORE funds to pay the following year's property taxes and/or insurance premiums, the Borrower is likely to end up in default of the reverse mortgage terms again for unpaid property taxes and/or insurance.

-10-

37. Relators have first-hand knowledge of the above practices through as a result of the

analysis of multiple reverse mortgage serving records of Borrowers who sought legal assistance in

dealing with foreclosures and potential foreclosures of reverse mortgages.

38. The following are illustrative, but no means exhaustive, examples[5] of the practices

which Relators have first-hand knowledge of:

## **Example 1:**

A client of CTC, M.R., was in arrears with Financial Freedom for $15,479.07 for unpaid property taxes and homeowner's insurance. On March 29, 2016, M.R. was approved for funding under ELMORE in the amount of $36,134.83. The approval document for the ELMORE loan is attached as Exhibit "C". As a result of the overage, CTC sent a Notice of Error, also known as a "qualified written request" ("QWR") under the Real Estate Settlement Procedures Act ("RESPA") to Freedom Financial requesting an explanation for the overage. In response to the QWR, Financial Freedom stated that "*it did not request $33,184.59*" from ELMORE and "*that any amount received beyond the delinquency amount was the decision of ELMORE.*" Financial Freedom posited "w*e are unable to return any overage to ELMORE.*" Financial Freedom's response to the QWR is attached as Exhibit "D." After receiving the response to the QWR, CTC communicated with the FHFC Hardest Hit Manager to request assistance. In response to the Manager inquiry, Financial Freedom claimed a mistake was made and returned the overage of $13,987.87. A copy of FHFC's email is attached as Exhibit "E." On August 29, 2016, FHFC advised that they received the $13,987.87 overage refund, but FHFC would apply the funds towards the borrower's principle loan balance. See email from FHFC attached as Exhibit "C."

## **Example 2:**

On April 1, 2016, CTC Client B.F. was approved for ELMORE funding in the amount of $43,022.84. At the time of the approval, B.F. owed Reverse Mortgage Solutions ("RMS") approximately $29,000.00 for unpaid taxes and property insurance. The ELMORE approval letter stated that $39,246.71 was paid to delinquent property charges and $3,776.13 was to be set aside for anticipated property charges. ELMORE approval docs are attached as Exhibit "F." In February of 2017, B.F. attempted to use the set aside funds to pay her property taxes in the amount of $1,205.09. RMS advised client that the set aside amount were unavailable to pay her property taxes because any balance remaining in the set account was applied to B.F.'s HECM principle loan balance, and that B.F. would need to pay the property taxes out of pocket.

## **Example 3:**

On February 25, 2016, CTC client S.A. was approved for ELMORE funding. At the time of approval S.A. owed Reverse Mortgage Solutions ("RMS") approximately $17,000.00 for unpaid property insurance and property taxes. However, RMS provided a reinstatement amount to

---

[5] The names and personal information of the Borrowers are being withheld as a result of confidentiality concerns.

ELMORE for $30,670.94. The ELMORE approval letter shows $28,115.56 was paid to delinquent property charges and $2,555.38 was set aside for anticipated property charges for the following year. A copy of the approval letter and closing documents are attached as Exhibit "E." In a response to a Notice of Error concerning the overage, RMS stated that $25,530.56 of the total amount approved was applied to the loan default, and the remainder was set aside for the Borrower's future property charges. However, RMS provided an itemized list of the corporate advances for taxes and insurance wherein RMS was only able to substantiate a default amount of $17,063.66. A copy of this letter is attached as Exhibit "F."

## Example 4:

CTC Client L.R was approved for funding under the ELMORE At the time of funding approval, L.R. owed Reverse Mortgage Solutions ("RMS") approximately $5,105.12 for unpaid taxes and property insurance. A copy of the consent judgement reflecting the corporate advances are attached as Exhibit "G". However, on or about April 1, 2016, RMS provided a reinstatement amount to ELMORE of $14,344,04. A copy of the consent judgement reflecting the corporate advances are attached as Exhibit "H." A copy of the ELMORE closing docs are attached as composite Exhibit "I".

## Example 5:

On April 1, 2016, CTC Client P.L. was approved for ELMORE funding. At the time of funding approval, BF owed Nationstar n/k/a Mr. Cooper LLC ("Mr. Cooper") approximately $2,772.01 for unpaid taxes and property insurance. A copy of the judgement showing the amount paid by the servicer for property taxes and insurance is attached as Exhibit "J." However, on or about April 1, 2016, Mr. Cooper provided a reinstatement amount to ELMORE of $12,989,34. The ELMORE approval letter shows $9,847.61 was applied to the delinquent property charges and $3,141.73 was set aside for anticipated property taxes and/or insurance payments. A copy of the ELMORE docs are attached as Exhibit "K."

## Example 6:

In a mortgage statement dated July 21, 2015, Financial Freedom advised CTC Client W.M. of a balance owing of $1,779.04 for unpaid property charges. A copy of the mortgage statement is attached as Exhibit "L". On June 19, 2015, W.M. was approved for ELMORE funding in the amount of $4,454,11. A copy of the ELMORE approval docs are attached as Exhibit "M." Of these funds, $1,779.04 was paid towards delinquent property charges and $2,675.07 was set aside for anticipated property tax and/or insurance payments. In Dec 2015, W.M attempted to use the ELMORE set aside funds to pay her 2016 property taxes. Financial Freedom denied W.M. access to the funds and advised her that the set aside was applied towards her principle loan balance. Pursuant to a QWR, Financial Freedom confirmed in writing that it would change its policy for Florida residents in that Financial Freedom would no longer apply ELMORE funds towards the borrower's principle loan balance, and the funds would be used to pay property charges until the account was depleted. A copy of the FF's email is attached as Exhibit "N". Financial Freedom released the set aside funds for W.M. to pay her property taxes. In July of 2017, Financial Freedom reversed its change in policy and continued applying the ELMORE funds towards the borrower's principle loan balance.

-12-

## Example 7:

In a mortgage statement dated October 1, 2016, RMS advised CTC Client C.C. of a balance owing of $6,872,89 for unpaid property charges. A copy of the mortgage statement is attached as Exhibit "O." On September 30, 2016, C.C. was approved for ELMORE funding in the amount of $15,362.59 with $12,411,83 applied to delinquent property charges and $2,950.76 set aside for anticipated property tax and/or insurance payments. Approval docs attached as Exhibit "P."

## Example 8:

CTC Client B.B was approved for ELMORE funding on April 22, 2016. The funding amount was $9,994,17 of which $7,420.35 was paid to delinquent property charges and $2,573.82 was set aside for anticipated property tax and/or insurance payments. Approval docs attached as Exhibit "S." In July of 2017, B.B attempted to use the set aside funds to pay property charges. However Financial Freedom declined the request asserting that the remaining set aside was applied to the principle loan balance. A complaint was submitted to Financial Freedom's Escalation Department. In response, Financial Freedom denied the request and applied the remaining balance to the principle loan balance and reversed its earlier position that it would use ELMORE set asides towards the Borrower's property charges until such account were depleted. See FF's letter attached as Exhibit "Q."

## Example 9:

In a letter dated July 29, 2015, Champion Mortgage advised CTC Client M.P. that $5,739.70 was owed for unpaid property taxes and homeowner's insurance. A copy of the letter is attached as Exhibit "R." On May 25, 2016, M.P. was approved for ELMORE funding in the amount of $17,784.16 of which $12,044.86 was applied to the default and $5,739.30 was set aside for anticipated property tax and/or insurance payments. Approval docs attached as Exhibit "S."

## Example 10:

JALA Client A.R. was sued for failure to maintain her taxes and/or insurance. JALA received a July 17, 2017 letter from Reverse Mortgage Solutions indicating $4,825.30 was due for property charges (taxes and/or insurance). In response to a Request for Information, RMS it received a total of $8,853.96 from ELMORE in August, 2017. RMS applied $4,825.30 to the property charges delinquency and kept $4,028.66 as reimbursement to itself for attorneys' fees and costs. RMS also received $3,134.49 from ELMORE to pay the premium for A.R.'s insurance carrier for the 2017/2018 insurance term. Instead RMS used this money to force place insurance with its own "insurer" rather than pay A.R.'s carrier. Her insurance was much cheaper. RMS then sought an additional $367.51 from A.R. to cover the difference in premiums.

## Example 11:

With respect to JALA Client D.G., RMS obtained $13,814.97 in funding from the ELMORE program on March 10, 2017. In response to a Request for Information forwarded to RMS by JALA, RMS, indicated D.G. owed it $3,871.12 in property charges. RMS paid itself

$3,871.12 for property charges and $7,902.50 for attorneys' fees and costs. RMS also received $2,041.35 as a set aside to pay D.G's insurance and taxes for the following year. RMS still has not paid the 2017 taxes with the ELMORE funds it received for that purpose.

39.     Relators have knowledge of the fraudulent scheme conducted by Defendants

through fraudulent claim and billing applications to the U.S. Department of Housing and Urban

Development ("HUD") and FNMA.

## VI.  CAUSES OF ACTION

## COUNT I - FALSE CLAIMS ACT VIOLATIONS (31 U.S.C.§ 3729(a)(1)(A)(B)(C))

40.     The allegations contained in Paragraphs 1 through 39 above are realleged and reaffirmed as if set forth hereat in full.

41.     Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an officer or employee of the United States Government, false or fraudulent claims for payment and approval.

42.     Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, false records or statements, to get false or fraudulent claims paid or approved.

43.     Based upon the false claims described above, Defendants directly or indirectly obtained payment from the United States Government for its services it provides to the mortgage industry.

44.     The United States Government has sustained damages because of the acts of the Defendants, as a result of the Defendants' violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)(B)(C) and 42 U.S.C. §1320a-7b(b) and has thereby damaged the United States Government by its action in an amount to be determined at trial.

-14-

## **COUNT II – FLORIDA FALSE CLAIMS ACT VIOLATIONS (Fla. Stat. §68.081 *et seq.*)**

45.     The allegations contained in Paragraphs 1 through 39 above are realleged and reaffirmed as if set forth hereat in full.

46.     This is a *qui tam* action brought by Relators and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*

47.     Fla. Stat. §68.082(2) provides liability for any person who –

(a)     knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c)     conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

48.     Had the State of Florida known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted in connection with Defendants' fraudulent and illegal practices.

49.     As a result of Defendants' violations of Fla. Stat. §68.081 *et seq.,* the State of Florida has been damaged.

50.     There are no bars to recovery under Fla. Stat. §68.081 *et seq.* and, or in the alternative, Relators are original source(s) as defined herein. Relators are non-profit corporations with direct and independent knowledge of the allegations of the Complaint, which have brought this action pursuant to Fla. Stat. §68.083(2) on behalf of themselves and the State of Florida.

51.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida.

## V.  PRAYER FOR RELIEF

WHEREFORE, Relators, Jacksonville Area Legal Aid, Inc. and Coast to Coast Legal Aid of South Florida, Inc. on behalf of themselves and the United States Government, pray:

(a)     That this Court Order the Defendants to cease and desist from violating 31 U.S.C. §3729(a)((1)(A)(B)(C) and Fla. Stat. §68.082(2);

(b)     That this Court enter judgment against Defendants in an amount equal to three   times the amount of damages the United States Government has sustained because for this action, plus a civil penalty of at least $5,000 to $10,000 for each action in violation of 31 U.S.C. §3729(a)((1)(A)(B)(C), and the costs of this action, with interest, including the costs of the United States Government for its expenses related to this action;

(c)     That in the event the United States Government continues to proceed with this action, Relators be awarded an amount for bringing this action in the amount of at least fifteen percent (15%) but not more than twenty-five percent (25%) of the proceeds of the action or settlement of the claim;

(d)     That in the event the State of Florida proceeds with an action brought by the Realtors under the Florida False Claims Act, the Realtors shall receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim;

-16-

(e) That in the event the United States Government does not proceed with this action, the Relators be awarded an amount that the Court decides is reasonable for collection the civil penalty and damages, which shall be not less than twenty-five percent (25%) nor more than thirty percent (30%) of the proceeds recovered;

(f) That in the event the State of Florida does not proceed with an action under the Florida False Claims Act, the Relators be awarded an amount that the court decides is reasonable for collecting the civil penalty and damages which shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. The person shall also receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable attorney fees and costs. All such expenses, fees, and costs shall be awarded against the defendant;

(g) That the United States Government, the State of Florida and Relators receive any other relief, both at law and at equity, to which they may reasonably appear entitled; and

(h) That the Relators be awarded relief including litigation costs and reasonable attorneys' fees.

## VI. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relators demand a trial by jury of all issues so triable.

WHERFORE, Relators respectfully request all relief described herein.

-17-

Dated: November $\underline{9^{th}}$ 2018

Respectfully submitted,

ROBERT W. MURPHY, ESQ.
Florida Bar No. 717223
1212 S.E. 2nd Avenue
Fort Lauderdale, Florida 33316
Telephone: (954) 763-8660
Fax: (954) 763-8607
E-mail: rwmurphy@lawfirmmurphy.com
*Attorney for Plaintiffs/Relators*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been hand-delivered by courier to: Clerk of U.S. District Court for the Southern District of Florida, U.S. Federal Building and Courthouse, 299 East Broward Boulevard, #108, Fort Lauderdale, Florida 33301, and mailed: postage prepaid, U.S. First Class Certified Mail- Return Receipt, this 9th day of November 2018, to:

Office of the Attorney General
Florida Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050

U.S. Attorney's Office
Southern District of Florida
500 East Broward Boulevard
Fort Lauderdale, Florida 33394

Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001


Attorney

-18-